UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br><br>Plaintiff,<br><br>vs.<br><br>**OPPENHEIMER & CO. INC.,**<br><br>Defendant. | No. 1:22-cv-7801<br><br>**COMPLAINT** |

Plaintiff Securities and Exchange Commission (the "Commission"), for its Complaint against Oppenheimer & Co. Inc. ("Oppenheimer" or "Defendant"), alleges as follows:

## SUMMARY OF ALLEGATIONS

1. This action concerns Oppenheimer's repeated failures to comply with the requirements of the "Limited Offering Exemption," which exempts certain "Limited Offerings" of municipal securities from the general requirement to provide disclosures to investors. The Limited Offering Exemption requires, among other things, that underwriters like Oppenheimer have a *reasonable belief* that the municipal securities are being sold only to sophisticated investors that are each buying the securities for a single account without a plan to distribute them.

2. Yet, from June 15, 2017 through April 27, 2022 (the "relevant period"), Oppenheimer sold securities in at least 354 municipal offerings in purported reliance on the Limited Offering Exemption when it had not satisfied the exemption requirements ("Violative Offerings"). In each Violative Offering, Oppenheimer sold municipal securities to broker-dealers and/or investment advisers when Oppenheimer did not have a reasonable belief that those entities were

1

buying for their own accounts. In fact, Oppenheimer knew or should have known those entities may have been buying the securities on behalf of their customer and/or client accounts. Despite this, Oppenheimer made no inquiry to determine if those entities were buying on behalf of their customers and/or clients and, if so, whether such investors met the exemption criteria. Thus, Oppenheimer failed to satisfy the Limited Offering Exemption because it sold the municipal securities without a reasonable belief that the broker-dealers and/or investment advisers, or any customers and/or clients on whose behalf they may have been buying, were both sophisticated and buying the securities for a single account.

3.  Throughout the relevant period, Oppenheimer lacked policies and procedures reasonably designed to ensure that it complied with the Limited Offering Exemption when acting as underwriter in Limited Offerings of municipal securities.

4.  At the same time, Oppenheimer made deceptive statements to municipal securities issuers by representing that it would and did comply with the Limited Offering Exemption requirements. Oppenheimer was negligent in making these statements because its regular practice was to not obtain the information necessary to know whether its sales of municipal securities would or did meet the Limited Offering Exemption requirements. The 354 Violative Offerings that Oppenheimer conducted did not meet the Limited Offering Exemption requirements, and Oppenheimer knew or should have known its statements to the contrary were deceptive.

5.  In connection with the 354 Violative Offerings it conducted, Oppenheimer realized at least $1,938,580 in net profits.

6.  Upon information and belief, Oppenheimer continues to underwrite what it purports to be Limited Offerings of new issue municipal securities without satisfying the Limited Offering Exemption requirements. Upon information and belief, Oppenheimer has also failed to

implement written policies and procedures reasonably designed to ensure compliance with the Limited Offering Exemption.

7. By engaging in the misconduct described herein, Oppenheimer violated, and unless restrained or enjoined by this Court, will continue to violate, Securities Exchange Act of 1934 ("Exchange Act") Rule 15c2-12 [17 C.F.R. § 240.15c2-12], Municipal Securities Rulemaking Board ("MSRB") Rules G-17 and G-27, and Exchange Act Section 15B(c)(1) [15 U.S.C. § 78o-4(c)(1)]. The Commission therefore seeks a judgment against Oppenheimer providing permanent injunctive relief and ordering Oppenheimer to pay disgorgement, plus prejudgment interest, and a civil money penalty, and any other appropriate and necessary equitable relief.

## JURISDICTION AND VENUE

8. The Commission brings this action, and this Court has jurisdiction, pursuant to Sections 21(d), 21(e), and 27(a) of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

9. Venue is proper in this District pursuant to Section 27(a) of the Exchange Act [15 U.S.C. § 78aa(a)] because certain acts, practices, transactions, and courses of business constituting the violations occurred in the Southern District of New York. Oppenheimer is headquartered in New York, New York.

10. Oppenheimer made use of the means or instrumentalities of interstate commerce or the mails in connection with the conduct alleged herein.

## DEFENDANT

11. **Oppenheimer & Co. Inc.** is a New York corporation headquartered in New York, NY and is a subsidiary of Oppenheimer Holdings Inc. Oppenheimer is registered with the Commission as a broker-dealer, investment adviser, and municipal advisor. As part of its

business, Oppenheimer participates as an underwriter in primary securities offerings by issuers, including municipal issuers.

## **BACKGROUND OF LIMITED OFFERINGS OF MUNICIPAL SECURITIES**

12. Municipal issuers of securities are public entities or municipalities, such as cities or counties, looking to offer securities in order to raise funds for public projects, such as schools or roads. As such, municipal issuers are generally exempt from the standard registration and reporting provisions imposed by the Securities Act of 1933 ("Securities Act") and the Exchange Act. However, Exchange Act Rule 15c2-12 [17 C.F.R. § 240.15c2-12] creates similar requirements by indirectly imposing disclosure requirements on municipal issuers through their underwriters.

13. Municipal securities offerings are generally facilitated by an underwriter, which is a broker-dealer that purchases a new issue of municipal securities from an issuer with a view to offer and sell those securities to investors. As underwriter, the broker-dealer typically takes on the risk and responsibility of finding investors to purchase the securities. In return, the underwriter has the opportunity to earn a profit between the price it pays the issuer for the securities and the price at which it sells them to investors.

14. Exchange Act Rule 15c2-12 generally requires that broker-dealers participating as underwriters in municipal securities offerings of $1 million or more obtain certain disclosures from issuers and facilitate the dissemination of those disclosures to investors. These disclosures enable municipal securities investors to make informed investment decisions and to protect themselves from potential misrepresentations or other fraudulent activities by brokers, dealers, and municipal securities dealers.

15. However, municipal issuers and their underwriters can avoid the burden and expense of these disclosure obligations if they meet the requirements of the Limited Offering Exemption provided in Exchange Act Rule 15c2-12(d)(1)(i) [17 C.F.R. §§ 240.15c-12(d)(1)(i)]. The Limited Offering Exemption applies to primary offerings of municipal securities if the offered securities are sold:

- "in authorized denominations of $100,000 or more;" and

- "to no more than thirty-five persons each of whom the [underwriter] *reasonably believes*:

    - has such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of the prospective investment; and
    - is not purchasing for more than one account or with a view to distributing the securities."

## FACTUAL ALLEGATIONS

16. Oppenheimer markets itself to municipal issuers as a leading underwriter of short-term municipal securities, including offerings conducted under the Limited Offering Exemption. Oppenheimer's marketing materials tout its "[f]ine-tuned [ ] Limited Placement Notes Issuance Process," as well as its "prowess" and "rare experience" with such offerings. Oppenheimer also markets Limited Offerings to municipal issuers in particular as a way to obtain "quick access to short-term funding," without the burden and expense of providing disclosure to investors. In its role as underwriter for Limited Offerings, Oppenheimer regularly markets and sells these securities to other broker-dealers and investment advisers, many of which are buying the securities on behalf of their own customer and/client accounts.

A.   **Oppenheimer Failed to Comply with the Limited Offering Exemption**

17. In order to comply with the Limited Offering Exemption, an underwriter must sell the securities in denominations of $100,000 or more and cannot sell to more than 35 investors. In

addition, the underwriter must "reasonably believe" each investor meets the stated sophistication criteria and is purchasing the securities for a single account. To meet these requirements, an underwriter must obtain certain information about investors, including, at a minimum, the size of each investor's investment, the number of investors, each investor's level of financial experience and/or sophistication, and whether each investor is buying the securities for a single account.

18. From June 15, 2017 to April 27, 2022, Oppenheimer acted as underwriter in 354 municipal offerings of $1 million or more and purported to comply with the Limited Offering Exemption. Yet, Oppenheimer neither sought nor received any of the information necessary to determine whether the investors met the criteria of the Limited Offering Exemption. Oppenheimer sold the securities to broker-dealers and investment advisers when Oppenheimer knew or should have known those entities may have been buying on behalf of customers and/or clients that were unknown to Oppenheimer. Thus Oppenheimer failed to satisfy the Limited Offering Exemption because Oppenheimer did not have a reasonable belief that the broker-dealers and investment advisers, or the customer(s) or client(s) on whose behalf they may have been buying, met the stated sophistication criteria and were purchasing the securities for a single account.

1. **Sales to Broker-Dealers**

19. In approximately 302 of the 354 Violative Offerings, Oppenheimer sold at least some of the municipal securities to other broker-dealers that were in the business of servicing their own brokerage customer accounts. When Oppenheimer sold the municipal securities to a broker-dealer, that broker-dealer often immediately re-sold the securities to one or more of its brokerage customers.

20. For example, on April 12, 2019, Oppenheimer purchased a $1.14 million offering from a New Jersey municipal issuer. The same day, Oppenheimer sold the entire offering to

another broker-dealer. Shortly thereafter, that broker-dealer broke up the block of securities it purchased from Oppenheimer and re-sold it to five different customer accounts (all of whom were unknown to Oppenheimer) in the following par amounts: $500,000; $300,000; $140,015; $100,000; and $100,000.

21. Oppenheimer's sales of securities to these broker-dealers did not satisfy the Limited Offering Exemption requirements. Oppenheimer did not reasonably believe the broker-dealers were buying the securities for their own accounts because the broker-dealers that were buying the securities were in the business of servicing brokerage customer accounts. Thus, in each instance, Oppenheimer knew or should have known that the broker-dealer representatives may not have been buying for the broker-dealer's own account, but rather, on behalf of its brokerage customer(s). Despite this, Oppenheimer made no inquiry to determine if the broker-dealer was purchasing on behalf of a customer(s), and if so, whether such brokerage customer(s) met the Limited Offering Exemption criteria. In particular, to the extent the broker-dealers were purchasing on behalf of their customers, Oppenheimer neither requested nor received information from the broker-dealers about: how many customers would receive the securities; how much each customer was investing; each customer's level of financial experience; or whether each customer was buying for a single account.

22. Without this information, Oppenheimer could not have formed the requisite reasonable belief that the broker-dealers, or the customers on whose behalf they may have been buying, were sufficiently sophisticated and buying for a single account, as the Limited Offering Exemption requires.

### 2. Sales to Investment Advisers

23. In the remaining approximately 52 of the 354 Violative Offerings, Oppenheimer sold at least some of the municipal securities to investment advisers that were institutional

brokerage customers of Oppenheimer. Similar to the sales to broker-dealers, when Oppenheimer sold the municipal securities to an investment adviser customer, that investment adviser often allocated the securities to one or more of its own advisory clients.

24. For example, on June 12, 2018, Oppenheimer purchased a $21 million offering from a New Jersey municipal issuer. On June 26, 2018, Oppenheimer sold $8,058,485 of the offering to one of its investment adviser customers. Shortly thereafter, the investment adviser broke up the $8,058,485 amount it purchased from Oppenheimer and allocated it to five different advisory client accounts (all of whom were unknown to Oppenheimer) in the following par amounts: $6,733,485; $675,000; $300,000; $250,000; and $100,000.

25. Oppenheimer's sales of securities to these investment advisers did not satisfy the Limited Offering Exemption requirements. Oppenheimer did not reasonably believe the investment advisers were buying the securities for their own accounts because these investment advisers were in the business of managing accounts for their advisory clients. Thus, in each instance, Oppenheimer knew or should have known that the investment adviser may not have been buying for its own account, but rather, on behalf of its advisory client(s). Despite this, as with the sales to broker-dealers, Oppenheimer made no inquiry to determine whether the investment adviser was purchasing on behalf of advisory client(s), and if so, whether such advisory client(s) met the Limited Offering Exemption criteria. In particular, to the extent the investment advisers were purchasing on behalf of their clients, Oppenheimer neither requested nor received information from the investment adviser about: how many clients would receive the securities; how much each client was investing; each client's level of financial experience; or whether each client was buying for a single account.

26.     Without this information, Oppenheimer could not have formed the requisite reasonable belief that the investment advisers, or the clients on whose behalf they may have been buying, were sufficiently sophisticated and buying for their own account, as the Limited Offering Exemption requires.

**B.      Oppenheimer's Policies and Procedures are Inadequate**

27.     Throughout the relevant period, Oppenheimer lacked policies and procedures reasonably designed to ensure compliance with the Limited Offering Exemption as required by MSRB Rule G-27(c).  MSRB Rule G-27(c) requires broker-dealers to adopt, maintain, and enforce written supervisory procedures (WSPs) reasonably designed to ensure that the conduct of the municipal securities activities of the broker-dealer and its associated persons comply with the Exchange Act and MSRB rules.

28.     Although Oppenheimer had WSPs which purported to summarize the requirements of the Limited Offering Exemption, those WSPs were entirely inadequate.  In particular, Oppenheimer's WSPs contained no reference to the requirement that Oppenheimer form a reasonable belief that the investor is not purchasing for more than one account or with a view to distributing the securities.  Oppenheimer's WSPs also did not instruct its personnel on obtaining information about investors in order to form the requisite reasonable belief that the investors (a) have such knowledge and experience in financial and business matters that they are capable of evaluating the merits and risks of the prospective investment; and (b) are not purchasing for more than one account or with a view to distributing the securities.

29.     Moreover, although Oppenheimer commonly sold Limited Offering securities to broker-dealers and investment advisers, Oppenheimer's WSPs contained no guidance on how to

comply with the Limited Offering Exemption requirements when selling to such an entity that may be purchasing on behalf of its customers and/or clients.

30. Upon information and belief, Oppenheimer has not modified or updated its WSPs to address these issues.

C. **Oppenheimer Negligently Made Deceptive Statements to Municipal Issuers**

31. In order to obtain and carry out its role as underwriter in these Violative Offerings, Oppenheimer negligently made deceptive statements to municipal issuers in violation of MSRB Rule G-17. MSRB Rule G-17 provides in relevant part that, in the conduct of its municipal securities business, every broker, dealer, and municipal securities dealer shall deal fairly with all persons and shall not engage in any deceptive, dishonest, or unfair practice.

32. Each of the Violative Offerings were initiated by a municipal issuer, which published a "Notice of Sale" describing the securities and certain terms on which the securities may be offered to investors. When a municipal issuer intends to take advantage of the Limited Offering Exemption, that issuer mandates in its Notice of Sale that the underwriter must comply with the Limited Offering Exemption in selling the securities to investors. In response to the Notice of Sale, any broker-dealer firm wishing to act as underwriter may submit a bid to buy the securities from the issuer, which the broker-dealer would then offer and sell to investors with the goal of making a profit on the price difference.

33. In connection with each of the Violative Offerings, Oppenheimer submitted a written bid to the municipal issuer offering to purchase the securities. In its written bids, Oppenheimer represented to the municipal issuers that it would comply with the terms of the Notice of Sale, including the requirement to offer the securities in accordance with the Limited Offering

Exemption. The purpose of these representations is to provide assurance to the municipal issuers that the underwriter will conduct the Limited Offerings in compliance with federal law.

34. Yet, for each Violative Offering, these representations were deceptive because Oppenheimer, in fact, did not comply with the requirements of the Limited Offering Exemption. And Oppenheimer was at least negligent in making these representations because Oppenheimer knew or should have known that its regular practice (as described above) was to sell the Limited Offering securities to broker-dealers and investment advisers without a reasonable belief that those entities, or the customers or clients on whose behalf they may have been buying, met the Limited Offering Exemption criteria. Oppenheimer also knew or should have known it regularly failed to request adequate information to know if the 35 investor limit and $100,000 denomination requirements of the Limited Offering Exemption would be met. And Oppenheimer knew or should have known that it lacked policies and procedures reasonably designed to ensure that its personnel complied with the requirements of the Limited Offering Exemption.

35. For example, on June 27, 2019, Oppenheimer purchased a $1.9 million offering from a New Jersey issuer. The issuer's Notice of Sale specified:

> The Notes are being offered in accordance with the "private placement" exemption in Rule 15c2-12 of the Securities and Exchange Commission ("Rule 15c2-12"). No offering document constituting an "official statement" will be prepared, and the Notes will be in minimum authorized denominations of $100,000. The successful bidder (the "Purchaser") will be required to deliver a certificate to the Borough and Bond Counsel at closing to the effect that the Purchaser agrees to purchase the Notes without an official statement and will not reoffer the Notes for sale or sell the Notes to more than thirty-five persons each of whom the Purchaser reasonably believes (i) has such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of the prospective investment and (ii) is not purchasing for more than one account or with a view to distributing the Notes.

36. Oppenheimer provided the issuer with a written bid seeking to purchase the securities "[s]ubject to the provisions of the [ ] Notice of Note Sale, which is made a part of this

11

proposal." On June 27, 2019 – the same day it purchased the securities from the issuer – Oppenheimer sold the entire offering to another broker-dealer. And, over the next several days, the broker-dealer re-sold the securities it purchased from Oppenheimer to six different customers (all of whom were unknown to Oppenheimer).

37. Despite having represented that it would comply with the specific requirements of the Limited Offering Exemption, Oppenheimer knew or should have known that the broker-dealer may have been buying on behalf of one or more brokerage customers that were unknown to Oppenheimer. Yet, Oppenheimer did not inquire or otherwise obtain any of the necessary information to ensure that it would and did comply. Thus, Oppenheimer could not have formed the requisite reasonable belief that the broker-dealer, or the customer(s) on whose behalf it was buying, was sophisticated and buying for a single account, as the Limited Offering Exemption requires.

38. After entering into transactions to purchase the securities from municipal issuers, but before actually receiving the securities, some municipal issuers imposed an additional requirement on Oppenheimer to certify that it had complied with the Limited Offering Exemption. Oppenheimer submitted to these issuers a signed "Certificate of Underwriter as to Rule 15c2-12," attesting that the securities had been sold: (a) "in minimum denominations of $100,000"; and (b) "to no more than thirty-five (35) persons each of whom [Oppenheimer] reasonably believes: (i) has such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of the prospective investment; and (ii) is not purchasing for more than one account or with a view to distributing the [securities]."

39. Oppenheimer's representation that it had complied with the specific requirements of the Limited Offering Exemption was patently false and deceptive. Either before or shortly after making these statements, Oppenheimer sold some or all of the subject municipal securities to

broker-dealers or investment advisers without a reasonable belief that those entities were buying for their own accounts. And Oppenheimer knew or should have known that it had neither requested nor received information to determine whether the broker-dealers or investment advisers were buying on behalf any customers and/or clients, and, if so, how sophisticated such customers and/or clients were, how much they were each buying, and whether they were buying the securities for a single account. Oppenheimer also knew or should have known it did not have adequate information to know if the 35 investor limit and $100,000 denomination requirements of the Limited Offering Exemption had been met.

D.     **Oppenheimer Profited from the Violative Offerings**

40.    Oppenheimer profited from the Violative Offerings by buying the municipal securities from the issuer and then re-selling them to investors at a higher price than it originally paid. After subtracting for routine business expenses incurred by Oppenheimer in connection with the offerings, including clearing costs and other fees, Oppenheimer realized at least $1,938,580 in net profits from the 354 Violative Offerings.

**TOLLING AGREEMENT**

41.    On May 4, 2022, Oppenheimer signed a tolling agreement with the Commission that specified a period of time (a "tolling period") in which "the running of any statute of limitations applicable to any action or proceeding against [Oppenheimer] authorized, instituted, or brought by . . . Commission . . . arising out of the [Commission's investigation of Oppenheimer's conduct], including any sanctions or relief that may be imposed therein, is tolled and suspended . . . ." The tolling agreement further provides that the Defendant and any of its agents or attorneys "shall not include the tolling period in the calculation of the running of any statute of limitations or for any

other time-related defense applicable to any proceeding, including any sanctions or relief that may be imposed therein, in asserting or relying upon any such time-related defense."

42. This agreement tolled the running of any limitations period or any other time-related defenses for Oppenheimer from April 27, 2022 to July 27, 2022.

**FIRST CLAIM FOR RELIEF**
**Violations of Exchange Act Rule 15c2-12**

43. The Commission realleges and incorporates by reference paragraphs 1 through 42 above, as if they were fully set forth herein.

44. The U.S. securities laws require that underwriters of municipal securities offerings comply with certain disclosure requirements or the requirements of an exemption to disclosure. By engaging in the conduct described above, Oppenheimer underwrote at least 354 primary offerings of municipal securities without complying with the disclosure requirements and without complying with an exemption from the disclosure requirements.

45. By engaging in the conduct described above, Oppenheimer violated Exchange Act Rule 15c2-12 [17 C.F.R. §§ 240.15c2-12], which states that it shall be unlawful for any broker, dealer, or municipal securities dealer to act as an underwriter in a primary offering of municipal securities with an aggregate principal amount of $1,000,000 or more unless the Participating Underwriter complies with the requirements of this section or is exempted from the provisions of this section.

46. By engaging in the foregoing misconduct, Oppenheimer violated, and unless restrained and enjoined will continue to violate, Exchange Act Rule 15c2-12 [17 C.F.R. §§ 240.15c2-12] by purporting to conduct Limited Offerings without satisfying the requirements of the Limited Offering Exemption set forth in Exchange Act Rule 15c2-12(d)(1) [17 C.F.R. §§ 240.15c2-12(d)(1)].

**SECOND CLAIM FOR RELIEF**
**Violations of MSRB Rule G-27**

47. The Commission realleges and incorporates by reference paragraphs 1 through 42 above, as if they were fully set forth herein.

48. By engaging in the conduct described above, Oppenheimer violated MSRB Rule G-27(c), which requires broker-dealers to adopt, maintain, and enforce written supervisory procedures reasonably designed to ensure that the conduct of the municipal securities activities of the broker-dealer and its associated persons are in compliance with the Exchange Act and MSRB rules.

49. Oppenheimer lacked written policies or procedures reasonably designed to ensure compliance with Exchange Act Rule 15c2-12 when Oppenheimer is purportedly conducting offerings of municipal securities under the Limited Offering Exemption.

50. By engaging in the foregoing misconduct, Oppenheimer violated, and unless restrained and enjoined will continue to violate, MSRB Rule G-27.

**THIRD CLAIM FOR RELIEF**
**Violations of MSRB Rule G-17**

51. The Commission realleges and incorporates by reference paragraphs 1 through 42 above, as if they were fully set forth herein.

52. By engaging in the conduct described above, Oppenheimer violated MSRB Rule G-17, which provides in relevant part that, in the conduct of its municipal securities business, every broker, dealer, and municipal securities dealer shall deal fairly with all persons and shall not engage in any deceptive, dishonest, or unfair practice.

53. Oppenheimer represented to municipal securities issuers that Oppenheimer would and/or did comply with the Limited Offering Exemption. These representations were deceptive

because Oppenheimer knew or should have known that it regularly and repeatedly sold the securities to broker-dealers and investment advisers without satisfying the exemption requirements.

54. By engaging in the foregoing misconduct, Oppenheimer violated, and unless restrained and enjoined will continue to violate, MSRB Rule G-17.

## FOURTH CLAIM FOR RELIEF
### Violation of Exchange Act Section 15B(c)(1)

55. The Commission realleges and incorporates by reference paragraphs 1 through 42 above, as if they were fully set forth herein.

56. By engaging in the conduct described above, Oppenheimer violated Exchange Action Section 15B(c)(1) [15 U.S.C. § 78o-4(c)(1)], which provides in relevant part that no broker, dealer, or municipal securities dealer shall make use of the mails or any means or instrumentality of interstate commerce to effect any transaction in, or to induce or attempt to induce the purchase or sale of, any municipal security, in contravention of any rule of the MSRB.

57. Oppenheimer violated MSRB Rules G-17 and G-27.

58. By engaging in the foregoing misconduct, Oppenheimer violated, and unless restrained and enjoined will continue to violate, Exchange Act Section 15B(c)(1).

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court enter a judgment:

A. Finding that Oppenheimer violated the federal securities laws and MSRB Rules alleged in this complaint;

B. Permanently restraining and enjoining Oppenheimer from violating the federal securities laws and MSRB Rules alleged in this complaint;

C. Ordering Oppenheimer to disgorge all ill-gotten gains received as a result of its unlawful conduct, plus prejudgment interest;

  D. Ordering Oppenheimer to pay civil penalties pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; and

  E. Granting such other and further equitable relief to the Commission as the Court deems just and appropriate.

Dated:  September 13, 2022      Respectfully submitted,

                 */s/ Devon Staren*
                 Devon Staren (*pro hac vice admission to be filed*)
                 Attorney for Plaintiff
                 U.S. Securities and Exchange Commission
                 100 F Street NE
                 Washington, DC 20549
                 (202) 551-5346 (Staren)
                 starend@sec.gov

Of Counsel:

Laura Cunningham
U.S. Securities and Exchange Commission
100 F. Street N.E.
Washington DC 20549